May it please the court. Good morning, your honors. My name is Darlene Ricker. I represent appellant Francisco Martinez. As a preliminary matter, I would withdraw the 924C sentencing arguments in the opening brief based upon the government's 24J letter. Unless the court wishes otherwise, I'd like to address, there are two issues that the parties basically agree constituted error, but we differ on the remedy for that error. And that would be the profit error and what the scope of resentencing should be. That determination depends largely on whether or not the error was harmless. And the burden here is on the government with regard to both issues to demonstrate that the error was harmless beyond a reasonable doubt. First, the Crawford issue. And I should have mentioned these issues that I'm speaking about apply to, my understanding is, all the defendants. So I'm speaking on behalf of all of us. And then other counsel will address specific issues. As to the Crawford error, the government does concede that there was error regarding the statements of cooperating defendants having been read into the record. But the government contends that's harmless on its premise that a rational jury would have convicted without the error. The government's brief relies basically on two cases on the harmless error issue, which are the Nida case and the Grasidis cases, both of which are distinguishable here on the facts. Those cases cited by the government were pre-Crawford issues, and neither of them were Confrontation Clause cases. They were jury instruction cases in which an element was omitted from the jury instruction. The finding of harmless error in both of those cases was based on the fact that the other evidence was overwhelming and uncontested. And I do concede there was substantial evidence presented on these issues in the case at Barr, but none of those issues were uncontested. They were all contested in the case at Barr, and that's what distinguishes this case before the Court from Nida and Grasidis. Harmless error analysis, of course, is very fact-specific. So I'd like to address that aspect in the case at Barr. The reason the government can't prove that the Crawford error was harmless beyond a reasonable doubt is multiple. First of all, it's impossible for us to determine what credit and weight the jury may have given these admissions of the co-defendants from their plea agreements. And we need to look also at the utility of these statements, not just the words of the statements. The nature and quality of these statements were from co-defendants who had pled guilty. And that can carry a lot of weight with jurors as opposed to other evidence that the government put on. The appellants, the defendants in the case at Barr, didn't have the opportunity to cross-examine any of these co-defendants with regards to their credibility, bias, motivation. Often in trial, at least from my experience at trial, in cross-examining those type of witnesses, had they testified, typically the defense would cross-examine them on their potential sentences, other charges, or cases that the government may have dismissed as part of their plea agreements, possibly any 5K motions that the government may have made, or may have been willing to make on their behalf. And we also need to look at the totality of the Crawford error viewed with the rest of the trial. And I'm alluding to the statement of the government in closing argument that, quote, and this applies only to Appellant Martinez, of course, that Martinez would have been getting out of jail absent this prosecution. So my problem with that is not in a vacuum taken in totality with the Crawford error. We don't know what caused the jury to convict, and we don't know how this tied in together to result in that verdict. Therefore, there are too many unknowns for the government to have proven Crawford error, beyond a reasonable doubt. With regards to sentencing, the government does agree that there should be a remand, but the government contends that it should be an Ameline limited remand. We contend it should be a full Booker remand, and it's the same harmless error standard. But the government can't prove that the error did not materially affect the sentence. And that's pursuant to U.S. v. Salazar-Gonzalez, which was ruled on August 15, 2006, by the court. In sentencing the defendants, the appellants in this case objected to enhancement of their sentences, and that preserved the Booker claim. They were enhanced with facts not proven to a jury. So under U.S. v. Salazar-Gonzalez, the appellants are entitled to a full remand, not just an Ameline remand. Exactly what took place at sentencing in terms of the objection? Do you have the language in your transcript? The – I'm sorry, I don't have the specifics in front of me, Your Honor, but the appellants did argue in their sentencing memoranda that they should not – their base offense level should not be increased and they should not be enhanced by the judge himself. So that preserved the Booker error. Perhaps you can find that language when you are seated. Yes, Your Honor. And just – I don't want to take up any more time unless the Court has questions, but the scope of the remand also depends on whether Judge Liu hears the resentencing, because Judge Liu was the district court judge. I believe His Honor has announced he's going to retire, but I have recently heard last week that that's a little bit up in the air right now. So under U.S. v. Sanders, if Judge Liu hears the resentencing and if this Court finds that it's an amyling-limited remand, that would be fine. But if Judge Liu does not hear it and it goes to another judge, a full resentencing would be required. Thank you. Are there other counsel who – Good morning, Your Honors. I am Philip Dykstra. I represent Appellant Zaragoza. Preliminarily I'd like to indicate that we would like to withdraw the argument set forth in the joint brief under subsection H. That's the interstate nexus argument that – the interstate nexus argument. On a review of that argument, it doesn't look as good as it did at the time we wrote it. So that – By we, you mean all three people that are – Yes, Your Honor. I'm the person that wrote that, and all three of us are in accord  with that. And I understood the 924C argument to be withdrawn on behalf of all of the defendants in the joint. That's accurate, Your Honor. Okay. I intend, with the Court's permission, to offer argument with regard to subsections D and E, the aiding and abetting argument as pertains to count 3, the drug conspiracy account, and the RICO account structuring issue that is set forth under subsection D of the opening brief. The basic contention in the – with regard to count 3 in the aiding and abetting section is that essentially it was the government's hypothesis that the drug conspiracy by a number of street drug persons that were unrelated or unconnected with CLCS or any of the persons, any of the appellants in this case. The area that – in which this crime occurred was essentially the MacArthur Park area, and there were a number of independent drug dealers in that area. And the theory of the government is that CLCS, by taxing that group and offering some form of protection to that group, they aided and abetted those persons. The contention that I'm offering is that the state of mind of the appellants in this case does not match the state of mind of the drug dealers. Essentially, under aiding and abetting, there needs to be a similar or the same state of mind. They need to share the intent. Under the Ninth Circuit model jury instruction, an aider and abetter needs to share each element of the underlying offense. What I am contending as regards to Count 3 is that the state of mind, that is, the intent of the alleged aiders and abetters and that of the drug dealers are different. The drug dealers intend that it is the specific intent to sell drugs. To the extent that those charged with aiding and abetting those persons are they don't share that particular intent. They have knowledge, certainly, of the intent of the drug dealers, but they do not share the same intent as the drug dealers. There is no evidence in this case that there's any profit sharing or anything like that, that they are a pre-agreed profit sharing understanding. Kennedy. Wasn't there some evidence that they took steps to actually make sure that drug dealers could sell as much as possible? They wanted them to sell a lot because they wanted to get their cut, call the tax, I know, but they wanted to, any way they could help their protected people sell drugs was good for them, right? If no drugs were sold, they'd lost a heck of a lot of income. That may or may not be accurate, Your Honor. May I say respectfully, I recall the testimony. The testimony by one of the persons that had been a CLCS member was that there was a fixed fee connected with the territory for particular drug dealers as distinguished from a profit sharing understanding amongst them. They would set up a fixed fee for X corner, period. And that had to be paid whether or not they sold gram one of any narcotics. And as a consequence, there is not, I would agree that there certainly was the hope or the wish on the part of those alleged to be haters and the betters, there is the hope and the people that they are helping in a sense of taxing do as well as they can. But their fees, the taxing numbers were not connected at all to the amount of drugs that were allegedly sold by the drug dealers or anything of that nature. So my contention is, as pertains to count three, that there just simply is not the evidence that all of the elements that are set forth match. That is, the haters and the betters simply do not share each of the elements involved in the underlying drug sale. Now with regard to the structuring issue that's set forth in argument number D, the contention that we've offered in that instance is that whatever structure was set forth by the government and established in the evidence, and I do agree that there was some very substantial evidence that a structure existed. What I'm suggesting, however, by the argument is that the structure that was set up was irrevocably intertwined with the predicate acts. And the cases that I've cited indicate that the structure has to be separate and apart from the commission of the predicate acts or those two elements basically merge. And that is set forth in detail, I think, in I think it's Chang versus Chen, one of the cases that we cited. In that particular case, it's again an answer to a case that's cited in our brief, that case indicated that there was a split of authority amongst the various circuits about whether or not the structure had to be, the structure of an enterprise had to be independent of the predicate acts. Chang versus Chen indicated that there were six jurisdictions that indicated that the two had to be separate. And basically there were two circuits that indicated that I think the language was essentially that the enterprise was the underlying pattern of racketeering activity. In Chang versus Chen, the court chose that this circuit follow the majority view, the majority view that the two elements must be separate, that there must be a showing of a structure in the alleged enterprise that's separate and apart and that is not inherent in the underlying predicate acts. Now how do you define the predicate act here? There were a number of predicate acts. There were I think eight or nine of them, including drug dealing. There were a series of homicides. All of the predicate acts that are set forth in racketeering acts one to nine. But aren't those separate from the organization to collect the rent? They were related in a sense because there's a contention and I think testimony that the homicides had something to do with the notion that there was some challenge to the rent collection process. So I'm saying that the structure, the underlying structure established by the prosecution in the case stemmed from the tax collecting process. It had tax collectors. They alleged that one of the appellants in this case was a leader that would oversee essentially the tax collection process. Counsel, let me just quickly remind you that your whole team has only three minutes left. Are you the last one who's going to be arguing for your group? I will submit, Your Honor. Thank you. If it pleases the Court, I, again, on behalf of Mr. Pina, and I would join in co-counsel's arguments and submit unless the Court has any questions. I don't believe we have separate questions for you. No questions. Thank you. Good morning, Your Honor. Alisa Peterson for Defendant Nelson Serrano-Garcia. Basically, Mr. Garcia's issues were very simple and it was in regards to whether he was a minor participant. And the district court committed error by failing to consider his culpability relative to that of the other defendants. And obviously, in this case, we have a very large criminal enterprise. There were murders, attempted murders. There were all kinds of things happening in this case. And compared to the other defendants, his role was very small. And the district court did not consider it. If you look at what the district court said in regards to the other defendants. You're saying didn't consider it, meaning didn't ever think about it or didn't consider in terms of infavorable terms? Did not. The district court made no indication on the record that they were comparing him to the culpability of the other defendants, which is what is required under U.S. v. Duran. It's the other participants, not necessarily defendants. Okay. Sorry. The other participants. The district court just did not consider that, consider it. Therefore, this case should be remanded so that the district court, you know, can establish that. Well, there was evidence that not only was he a driver, but he was a collector and collected rather large sums of money from time to time. So it would seem that he could be a major participant even if he wasn't doing as many bad things as some of the others. Well, I think the whole point is that the district court should have made a finding as far as comparing his culpability to that of the other defendants. And that just wasn't done. And so that's the point. And as far as the Booker remand, basically the defendant wants, just wants a remand to have this issue decided. But no Emeline remand. Right. Correct. That's all I have, Your Honor, unless the Court has further questions. I think we don't. Thank you. Thank you. And we'll hear from now from the government. Yes, Your Honor. Can I have 10 seconds to consolidate? Sure. While you're doing that, I'll just mention it might be easier since the appellants don't have a whole lot of time left. If you can consolidate your responses, if possible, that will be helpful, because you don't have a lot of rebuttal time left. You may begin. Thank you, Your Honor. Your Honor, may it please the Court, Bruce Reardon for the United States, appearing with me is Andrea Russi. We both appeared on the appellate brief. I was one of the counsel at trial and, in fact, go back so far as to be the counsel who filed the government's sealed excerpt of record on October 22, 1998. If it please the Court, I will address all the issues except for sentencing and ask for two minutes at the end of the 20 for Ms. Russi to address sentencing arguments such as the Serrano-Garcia issue. Your Honors, we will cut directly to the chase and get to what we believe is the single issue of most importance today, the issue that we concede is error and needs, therefore, to be determined that the error was harmless, which is the Confrontation Clause error. We can't address any question the Court has in the next 16 to 18 minutes, but that issue we will move to the front. That was our consultation. That issue, of course, the evidence was admitted through a proper channels after hearing with the Court and argued. Crawford came out in 2004, abrogated the case we relied on. We did hear what we believe this Court has asked the government to do in cases like this, take a hard look at your evidence and concede if there's error, and we have conceded that there was error. We do believe that under the standard for harmless error, we have been able to convince the Court through our briefs and hopefully the Court will find that it was harmless error. There are two levels of analysis. I'm sure this Court is well aware we meet both. Under Delaware v. Van Arsdale and since Delaware v. Van Arsdale, this Court and every Court has applied the test of whether this Court can look at the verdicts and determine beyond a reasonable doubt that this three pages of trial transcript, not testimony, but this stipulation entered into evidence, did not contribute to the verdicts or to put another way, as the Nieder Court puts it, that this Court can determine that the verdicts would be the same but for the error. And Delaware v. Van Arsdale and since then the cases of Bowman cited in the appellant's brief, Nielsen from just a year ago, I believe, or 18 months ago, this Court analyzed a Crawford error under Nielsen. It's not in our brief, Your Honor. The site is not tripping off my tongue right now. What's your specific reason for saying that it's harmless? Is it that similar evidence came in otherwise? Is it there was so much evidence otherwise? I mean, this is a long lead-in to, you know, what's implied. All four reasons, Your Honor. The stipulation was evidence of little consequence. It was evidence that was cumulative in every instance. It was evidence that was corroborated in every instance by other direct evidence on each of the points. And the overwhelming evidence of the government's case swamps the single read of error. In this case, if I may, and get right to it, the stipulation breaks down to about three parts. That's what I'm trying to get you to do, to get right to it. I apologize, Your Honor. The stipulation breaks down to three parts. The Rodriguez and Ramirez statements, the Hernandez and Lopez statements, and the Gonzales statement. The Hernandez-Lopez statement are basically the same statement. They're a husband and wife. They both state, we possessed crack cocaine on September 9, 1999. The Rodriguez-Ramirez statements were two rent collectors, Little Jr. Ramirez and Loreno Rodriguez, who admit we were rent collectors. Little Jr. admits I had rent collections in my pocket on June 22, 1999. Those four statements are particularly far afield from any of the defendants. Nothing in the stipulation even refers to the defendants. The district court insisted upon that, and in hindsight, that was an excellent decision. It watered down the stipulation to the point where the stipulation doesn't even refer to the defendants. There's no link to the defendants. The Rodriguez-Ramirez rent collection and the Hernandez-Lopez dope dealing, those facts were proven beyond any dispute in this trial. The appellants concede that in their opening brief on both points, and at trial we had the narcotics that were referred to in the stipulation was brought in as evidence as part of a search and seizure on a search warrant. Joanna Lopez's accounting records were found, and there were a treasure trove of information breaking down day by day who were her dealers and what money she collected. There was evidence of her being videotaped making a payment of rent collection to Nelson Serrano Garcia. There was evidence of dope narcotics, I should say, recovered from Gerd William Pineda, Cesar Rodas in the case, Christian Cologne was proven to be a drug dealer, Flacco Alcontrara was proven to be a drug dealer, and even La Madela, a woman apparently of great beauty, was proven to be a drug dealer. So the drug dealing evidence was overwhelming. Romero and Hernandez testified to it in detail. The rent collection evidence was even greater. For instance, Rodriguez, in the stacks of money found at Martinez's stash pad, which she used, Janie Garcia's mother, to stash their nest egg, the $450,000, 40,000 were segregated from Mr. Zaragoza. The stacks were stacked up by dealer, I'm sorry, by rent collector and sometimes by streets. It included Mr. Rodriguez, Moreno Rodriguez, as one of the stacks. Others like Woody, Tiny, Smokey, Pee Wee, and sometimes it was streets, Hollywood, Alvarado. It was extremely well organized and well kept. The evidence of rent collection, there was surveillance of each rent collector. Testimony from Sanford about that. 300 wiretap calls were, approximately 200 were about rent collection. There is an evidence from, again, Romero and Hernandez who literally detailed it. Hernandez as a rent collector and Romero as the shot caller who organized all the money for the Mexican mafia. Those four aside, if I may, the Gonzales statements are the only ones on our review that even resemble the cases of Bowman and Nielsen where this court found there was harmless error. And I say that only because it's weaker evidence. It was extremely tamped down evidence. But they resemble Bowman and Nielsen because the two statements from Gonzales, I gave two guns to Spider Steven Villa, and the UConn, the GMC UConn was paid for in drug proceeds, $19,000. Those two statements, not referring to Mr. Zaragoza, although he is her husband, he is charged, that's from Racketeering Act 4, the conspiracy to kill Valerio, Ojos, Eyes, or Greedy as he was sometimes known, and Racketeering Act 15, the UConn. Racketeering Act 4 was also charged in Count 6. Racketeering Act 15, the UConn, was not charged in the substantive count. Independent of those stipulations, the evidence on the Ojos conspiracy was overwhelming. We had letters from Mr. Zaragoza to his wife, Ms. Gonzales, to give two toys, two letters, give the two toys to Mr. Villa. He also called her and reminded her of Mr. Villa was the guy you gave the guns to in a call where, probably as often true of husband and wife calls, they really weren't listening to each other, and Ms. Gonzales had no idea who he was talking about. He kept saying, has Stephen come? Has Stephen been there? And finally, who? The guy you gave the guns to. In fact, Mr. Zaragoza testified in the trial and admitted that, openly said, yes, I wanted to kill Greedy. I did conspire to kill Greedy. I did ask Villa to do it for me. I did arrange to have the two guns get to Villa. I hated Greedy because he snitched me out and he says I'm responsible for these murders I didn't commit. Zaragoza was a remarkable witness. He danced a fine line, basically saying, but it was not an enterprise act. It was a personal vendetta I had with Greedy. And in fact, Mr. Villa and I did not agree he was doing it as a favor. And Mr. Zaragoza's statements overwhelm that stipulation by Gonzales. It is difficult for me to conceive of him as an advocate of better evidence. Mr. Zaragoza conceded that crime. He conceded the attack on Jesse Holguin, but said it was self-defense. That's payaso. He conceded the collection of rent. Mr. Zaragoza's testimony concedes many of the points raised by the defense. But with regard to that Crawford error, this case had that stipulation really was watered down to the point where it was basically fallow ground. It was virtually unused. We didn't make use of it as a sword during the trial in any way, such as this stipulation proves that. There was no inference this stipulation means this. No one testified about it. As in Bochting, this Court pointed out, a concern is when there is direct, vivid, crucial testimony that creates a confrontation clause error. We submit this is 180 degrees different from that. I hope that answers the Court's question. I can also go on to the Yukon. The Yukon GMC had a seizure at Gonzales' house. The bill of sale for the Yukon was found, paid in cash, $19,287, if I have the numbers right. Gonzales also was seen in the Yukon, photographed in the Yukon. The Yukon was at the house at the time of the seizure. In addition, Gonzales' forensic accounting was made of Gonzales' receipts that were seized in the search, as well as receipts that were found by way of subpoena. And only on known expenditures, the FBI forensic accountant determined that during the time period of 1995 to 2000, Ms. Gonzales, who was on food stamps and welfare, had known expenditures of $250,000 and no job, no income. Of course, there's other expenditures that no one knew about. Ms. Gonzales, Mr. Zaragoza on the stand, conceded that Ms. Gonzales collected his rent for him. He called it his salary or allowance. He also conceded that she spent it any way she wanted it, and, in fact, spent too much. Therefore, we think that the evidence on all four of the tests that are enunciated in Bowman, and this Court enunciates, very slight significance, great overwhelming evidence of guilt, cumulative in every way, and corroborated in every way, it was evidence that simply was unnecessary. And looking back at it, it was largely brought in because, at the time, we thought Junior was going to go to trial. He pled out three days early. Little Junior was his assistant. Pineda was going to go to trial, pled out that day. The stipulation may have been interesting for them, but the stipulation laid fallow. It is a known, as opposed to an unknown, because there is so much evidence of the guilt of Zaragoza, Martinez, and Pineda, and particularly with regard to Racketeering Act 4 and 15. Moving on, if I may, to address the enterprise question. These predicate acts were separate and apart. The CLCS, the evidence was clear that this was a structure that was separate and apart. It was an existing gang. Romero and Jimenez's testimony is, oh, I have one other point I have to clarify. These five people, the statements came from, were not cooperating defendants. There was no cooperation with them. That's just been a misunderstanding. It's understandable. Ms. Ricker was not at trial. I have a great deal of admiration for her as counsel, but it's just a misunderstanding. They were not cooperating defendants. I don't think that makes any difference, but it is a misunderstanding. The evidence I would point the court to of enterprise and the evidence and law that I would point the court to on aiding and abetting, Government's Exhibit 187A, which is at GER 35, is a lengthy call between Joanna Lopez, one of the drug dealers, the most prominent, and Juan Romero, who at the time was the shot caller, in which she literally talks about, I don't have enough of your people out here. The gang operated as a functional protection racket for the drug dealers. The drug dealers paid a percentage, not a fixed fee. There was no evidence of fixed fee. That might be from another case. Where's that evidence about the percent in the record? The percent in the record comes specifically from Jimenez and Romero. Their testimony is at GER 451 to 532 for Romero and GER 410 to 43 for Jimenez. I can't cite the court to the exact page in that testimony as I stand here, but Romero and Jimenez talk about how the percentages went up with the sales, and Romero in particular, who came on board as the shot caller in 94, testifies how they continually ramped up the percentages, and that's why they had their people out there. The people were out there to see how much money was being made. It was a constant dance between the drug dealers, and the calls indicate this, a constant dance between drug dealers who were lowballing the gang and the gang who wanted more. It was not some fixed fee. It was a classic protection racket in which the gang offered protection to the drug dealers who had no other way of getting protection, and I would only point this court to the Shryock decision at 969. I can't think of the exact site in the Fed Third, but at 969, Shryock addresses the aiding and abetting argument on the same premise raised by Mr. Deitch, that it's not aiding and abetting, and Shryock finds that, and by the way, Shryock dealt with the same neighborhood in 94 and earlier. The McArthur Park area, and Joanna Lopez is referenced in the Shryock opinion as one of the rent collectors who pays money. Shryock involved, Ernie Castro, who was collecting the money in Shryock, it was his collector, Chuco Lopez, who was killed by Mr. Zaragoza and Mr. Romero on Mr. Martinez's orders in 94. That's when the CLCS took over with that killing, and then turned it into a McDonald's, if you will, an incredibly successful $80,000 a week business for the enterprise itself at $80,000 a week towards 1999. And that evidence from Romero and Jimenez discusses how they collected the money and how they, what kind of numbers they collected. It also points out that this was a separate apart organization. They were both CLCS. They knew they were CLCS. They followed orders from Martinez, from Romero. They did not, drug dealers were doing their own thing. But they were paying for protection. They were paying rent. And in Shryock, it points out that that control, that authority, that assignment of streets, that profit sharing, and the use of violence when there's a problem in the neighborhood is very much aiding and abetting, and this is the same premise. I believe that there was one, oh, the merger issue. The only other issue that my notes show was raised that needs a response before I turn this over to Ms. Russey or any questions from this bench. There was no merger. This was a, the predicate acts were not, this is not a case where dope dealers are charged with being racketeers. There are cases out there that when that happens, there could be a problem with merger. This is a case where racketeers, gang members, have found an extremely lucrative, in fact, rudimentary but brilliant business that goes undetected by state authorities because there's no, there's no, they can't get to it without wiretaps. That's the necessity argument. The wiretaps allow the phones and the actual corpus delecti of the crime, the discussion of the business to be captured, and that is a separate and apart and ongoing and continuous. CLCS existed before they decided to start collecting rent. They exist to this very day. However, during this time period, they were a highly lucrative business, and the evidence demonstrated a decision making, as Mr. Zaragoza put it, Frank Martinez making the ultimate decision, and there's a great deal of evidence, the Pena series of letters in our record, the Zaragoza Jr. dispute series of letters in our record, and the Romero green light, trying to kill Romero, Zaragoza's decision that he wanted to kill Romero, and ultimately getting the green light from his dad, Mr. Martinez. Those really show how disputes are resolved, how soldiers are introduced, that was Mr. Pena, and how a big decision to terminate a leading employee, in this case, fumigate the rat, send him to the cemetery. Romero was made. That addresses the points I made in my notes. Any questions from the Court? I believe not. Ms. Russi can have a later time. If I did satisfy you by getting to the details, I want to make sure. If I didn't, thank you. I will first address the sentencing issues as far as whether a limited Ammaline remand or a full Booker resentencing is appropriate. In their brief, defendants argue that application of sentencing enhancements constitutes Sixth Amendment error that requires a full resentencing, and this is not the correct reading of Booker. In Ammaline, this Court said that judicial fact-finding is only erroneous when coupled with a mandatory application of the guidelines. So, for that reason, the government believes that all three defendants here are entitled to a limited Ammaline remand only. Turning to Mr. Serrano-Garcia, Serrano-Garcia was Romero, who was the shot caller. He was Romero's driver, and he was a rent collector. And the PSR and the government both argued that he was not entitled to any reduction for minor role. And the district court found at sentencing that his participation and activities are much more than minor or minimal role. Counsel, the argument is made that the district court did not compare the level of activity of Mr. Serrano-Garcia with that of other participants in the enterprise. What is your response to that? My response to that is that the district court did not explicitly state that he was comparing Serrano-Garcia to the other participants, but I don't think he had an obligation to do that. In Sanchez-Lopez, this Court held that a simple statement that a defendant did not play a minor role is enough. And that is the statement that Judge Liu made here. He presided over the trial. He also conducted the sentencing on all of the other defendants. And I think that from his role, he was able to compare Serrano-Garcia to everyone else that he sentenced, and there was not an obligation that he state that he was explicitly making that comparison. If the Court has no further questions, I'll submit. I believe that is all of our questions. Thank you. And appellants, counsel? Sure. No problem. Thank you, Your Honors. This will be very brief. With regard to the Crawford error,  the statements were basically regarding drugs and rent collections. It doesn't matter that the statements didn't mention any of the three defendants because this was a RICO conspiracy case, and the defendants were held to the activities of others. Also, I did not mean to mislead the Court or to suggest that these were cooperating defendants, although Mr. Reardon is correct. That was not trial counsel. But regardless, it doesn't matter whether or not these statements came from cooperating defendants. What does matter is under U.S. v. Lawson, which is an opinion of this Court from August 28th of this year, the question with regard to a Crawford error was this. Was the jury left with sufficient other information to assess the credibility of the non-testifying defendants? And that's what we have here. And that's essentially all I have on that issue. Thank you. Thank you. The time has expired, and we appreciate the arguments of all counsel. The cases just argued are submitted.
judges: B. Fletcher, Fernandez, Graber